Neil G. Sparber
Samantha Beltre
Fulbright & Jaworski L.L.P.
666 Fifth Avenue
New York, New York  10103
Attorneys for Plaintiff Marisa F. Jacobs
nsparber@fulbright.com
sbeltre@fulbright.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

MARISA F. JACOBS,

        Plaintiff,

  -against-

CLAIRE'S STORES, INC.

        Defendant.

-----------------------------------------------------------------------x

08 Civ. _____

**COMPLAINT**

**Jury Trial Demanded**



    Plaintiff, Marisa F. Jacobs, by her attorneys, Fulbright & Jaworski, L.L.P., as and for her complaint, alleges as follows:

THE PARTIES

    1.    Plaintiff Marisa F. Jacobs. ("Jacobs") is a an individual who is a citizen of the State of New Jersey and maintains a residence at 1530 Palisade Avenue, #21-H, Fort Lee, New Jersey 07024.  At all relevant times herein, Jacobs worked for the defendant, Claire's Stores, Inc., at offices located at 350 Fifth Avenue, Suite 900, New York, New York 10118.

    2.    Defendant Claire's Stores, Inc. ("Claire's") is a corporation formed under the laws of the State of Florida and maintains its principal office at 3 SW 129th Avenue, Pembroke Pines, Florida 33027. At all relevant times, Claire's maintained an office located at 350 Fifth Avenue, New York, New York 10118.

80197471.3

JURISDICTION

3. This Court has jurisdiction of this claim pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 because it is the judicial district in which a substantial part of the events giving rise to the claim occurred and, at all relevant times, Claire's maintained an office in this district.

FIRST CLAIM FOR RELIEF

5. Claire's is a leading specialty retailer of value-priced jewelry and accessories. Claire's and its predecessors have been operating since approximately 1961 and became listed on the New York Stock Exchange in 1985. In 2007, Claire's operated in excess of 3,000 stores throughout the world.

6. In September 2003, Jacobs commenced her employment with Claire's as Vice President of Investor Relations and Corporate Communication. Jacobs had been a successful attorney in private practice and as an in-house counsel at a large corporation. Jacobs had also spent in excess of seven years working in investor relations before joining Claire's, including at large multi-national firms Hill & Knowlton and Gavin Anderson & Co. In fact, Claire's was a client of Jacobs at Gavin Anderson & Co. before she joined Claires. Her position at Claire's required Jacobs to manage the flow of business and financial information between Claire's, the investment community, the general public and Claire's employees through interaction with investors, potential investors, securities analysts, journalists and employees here and abroad. Jacobs served as one of only two global corporate spokespersons, together with the Chief Executive Officer of Claire's, when responding to media inquiries, especially with respect to issues involving the company's strategy or issues that could affect its corporate reputation.

Jacobs also provided input to management and the Board of Directors regarding, concerns raised by shareholders, customers and special interest groups as well as competitive activity and societal trends, which might impact the company.

7.  In or around 2006 and into 2007, Claire's undertook a review of strategic alternatives available to the company. Jacobs was a valuable employee of Claire's but did not have an employment agreement with Claire's. In order to protect Jacobs, and to provide incentives for Jacobs to remain with the company through uncertain times, Claire's entered into a Change In Control Termination Protection Agreement with Jacobs, effective December 15, 2006 (the "Agreement"). The Agreement provided that it would remain in effect until at least December 15, 2008 and, if a Change of Control Occurred, (as defined in the Agreement), the Agreement would remain in effect for two years following the Change in Control.

8.  A Change of Control occurred on or about May 29, 2007 when Claire's was sold to Apollo Management, L.P. and certain affiliated co-investment partnerships. On or about May 29, 2007 Claire's ceased to be a public company listed on the New York Stock Exchange and became a private corporation. At the same time, however, the company issued several tranches of debt giving rise to a group of institutional debtholders interested in the company's performance, in lieu of shareholders.

9.  The Agreement provided, among other things, that upon a Change of Control (i) any time periods, conditions or contingencies relating to the exercise or realization of, or lapse of restriction under any outstanding equity incentive award held by Jacobs would automatically be accelerated and be paid in cash 15 business days after the Change of Control, (ii) all amounts accrued under Claire's 1999 and 2005 Management Deferred Compensation Plans would be paid in cash within 15 days of the Change of Control; (iii) all previously deferred annual bonus

payments would be paid in cash 15 business days after the Change of Control; (iv) subject to Jacobs's continued employment with Claire's through the date of the Change of Control, Jacobs would be paid a lump sum amount in cash equal to 6 month's base salary plus 50% of the Bonus amount that Jacobs would be entitled to receive for "plan" level performance with respect to the Company's fiscal year ending January 31, 2007, and (v) in consideration of the payments and benefits provided for in the Agreement, Jacobs agreed to be bound by certain restrictive covenant provisions.

10. All of the amounts and benefits to which Jacobs was entitled as of the date of the Change of Control, and as set forth above, were paid to Jacobs by Claire's.

11. Jacobs continued to be employed by Claire's after the Change of Control. The Agreement also provides that if Jacobs's employment with Claire's is terminated at any time within two years following the Change of Control by Claire's with Cause (as defined in the Agreement) or by Jacobs for Good Reason (as defined in the Agreement), Jacobs would be entitled to various additional payments and benefits set forth the in the Agreement, subject to the execution of a general release in favor of Claire's by Jacobs.

12. The Agreement defines "Good Reason" as any of the following actions on or after a change of control without Jacobs express prior written approval, other than due to Jacobs' total disability or death:

    (a) Any materially adverse alteration in Executive's title or in the nature or status of Executive's responsibilities or conditions of employment from those in effect immediately prior to such Change in Control;

    (b) A reduction in Executive's Base Salary and/or Target Bonus;

    (c) A relocation of Executive's principal place of employment to a location more than 35 miles from such location, except for business travel substantially consistent with Executive's business travel obligations prior to the Change in Control;

(d) The failure of any successor or assignee (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business and/or assets of the Company in connection with any Change in Control, to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform any such agreement if no such succession or assignment had taken place; or

(e) Any purported termination of Executive's employment that is not effected pursuant to a notice of termination satisfying the requirements of the Agreement.

13. Subsequent to the Change in Control, the nature and status of Jacobs' responsibilities and conditions of employment were materially adversely altered in numerous ways from those responsibilities, status and conditions of employment that were in effect immediately prior to the Change in Control. By way of example only[1], prior to the Change in Control, Jacobs reported to the Co-Chief Executive Officers (who left immediately following the Change of Control and were replaced by a single Chief Executive Officer, Gene Kahn ("Kahn")), one of whom worked in New York. Jacobs interacted with them constantly, so that she was always apprised of corporate developments and was consulted by the Co-Chief Executive Officer about the impact of those developments on the company's investors or its corporate reputation.

14. Subsequent to the Change in Control, Jacobs began to report to Kahn, who was located in Hoffman Estates, Illinois. Kahn was rarely in New York and, when he was, he almost never met with Jacobs. When he was elsewhere, he rarely contacted her by phone or email. When Jacobs was in Hoffman Estates she never met with Kahn alone, and in fact, had very limited interaction with him of any kind.

15. Shortly after his arrival Kahn advised Jacobs that absent an emergency, it would be best for her to communicate with him by email rather than by phone. From the time of the Change in Control until Jacobs terminated her employment with Good Reason, Kahn almost

---

[1] The complaint contains a number of examples of how the job responsibilities and terms and conditions of employment of Jacobs were changed after the Change in Control but they are examples only and are not a total account of all the changes that diminished her job.

never met in person with Jacobs. This was in sharp contrast to the steady steam of meetings he had with his other direct reports. In addition, in stark contrast to the former Co-Chief Executive Officer, Kahn almost never sought Jacobs counsel regarding the impact on the company's reputation or standing with institutional investors resulting from changes in corporate strategy or other new developments.

16.    Kahn also established a Senior Management Team which excluded Jacobs. She asked Kahn to include her in his team, or at least permit her to attend that team's meetings, so that she could remain current with respect to corporate changes and their underlying rationale and continue the consultative nature of her job, but Kahn denied her request. Jacobs was also systematically excluded from almost all other meetings that other senior executives attended, whether in person, by phone or videoconference, that involved business, financial and/or strategy reviews and discussions of new initiatives. Attendance at such meetings were important for Jacobs to be able to competently carry out her job responsibilities and were events that Jacobs attended regularly before the Change in Control. In addition to being systematically excluded from management meetings, Jacobs was never introduced to the reconstituted Board of Directors and her previously routine Board reports and Board appearances were no longer requested. As a result, her knowledge of and insight into the company ceased to be current, and materially impaired her ability to discuss corporate developments with the investment community and the media, which was the crux of her job. Despite her best efforts, over time certain investors expressed their dismay to Jacobs, saying she had become far less helpful to them than in the past and there was little point in calling her for information. Jacobs was asked repeatedly by institutional investors or the media to provide more detailed information than she was doing, but

limitations placed on her by Kahn and others (as described more fully below), prevented her from doing so.

17. After the Change in Control, Jacobs also had discussions with Kahn and certain individuals from Apollo, including Peter Copses, Lance Milken and Troy Nelson (the "Apollo Representatives"), regarding the function of investor relations and corporate communications at the company now that shareholders had been eliminated and replaced by debtholders. Jacobs was told repeatedly that her prior standards of openness and cooperation with investors and the media should not be maintained and that many of the activities in which she engaged, other than the issuance of a quarterly earnings releases and the holding of a related quarterly earnings conference call, would be discontinued. As the months went by, the list of subjects Jacobs was no longer in a position to discuss freely grew longer, making it increasingly difficult for her to respond to external inquiries.

18. The preparation and issuance of monthly press releases reporting on sales and same store sales for the prior month were discontinued. Similarly; the provision of quarterly and annual financial guidance and the discussion of any forward looking information that would help investors to understand future trends in and the direction of the business was ended. Meetings between the investment community and the Chief Executive Officer and Chief Financial Officer, which Jacobs had previously arranged, were discontinued. Previous to the Change in Control, Jacobs had prepared investor presentations in connection with the meetings and followed up with investors subsequent to the meetings.

19. Subsequent to the Change in Control, Jacobs no longer wrote and produced an annual shareholders report; or participated in the preparation for, and holding of, an annual shareholders meeting. Moreover, Jacobs no longer facilitated the print and/or television

interviews of the Chief Executive Officer by the media, which consisted of Jacobs working on arranging the interview, story development, providing the reporter with background information on the company and the Chief Executive Officers, developing key messages for use by the Chief Executive Officers and otherwise preparing the Chief Executive Officers for every interview and accompanying them to those appointments. Jacobs also no longer was interviewed personally by the media on stories relating to the status of the business, key fashion trends or demographic trends relating to the company's tween and teen customers.

20. Jacobs had several meetings with Kahn after the Change in Control in which Kahn expressed his uncertainty as to how best utilize Jacobs' spare time in light of the elimination of the substantial portion of her job. Jacobs offered to assume greater responsibility in the area of market research (which she had directed on several occasions) and also offered to become involved in overseeing customer relations and developing a public relations program. She also agreed, at Kahn's request, to spend six months traveling to Hoffman Estates for 3-4 days per week, to be followed by the relocation of her family to Hoffman Estates, to work more closely with him. Jacobs consented to Kahn's requested travel and relocation plan but requested a written agreement setting forth the agreed upon terms. Kahn hesitated at that point, advised Jacobs that he would think it over and, if he decided to move forward, to contact Legal or Human Resources to prepare the agreement. Despite Jacobs follow-up inquires about the time when she should begin traveling or moving to Hoffman Estates, Kahn did not respond. Jacobs also made offers of assistance to several other corporate officers as well as various consultants retained by Kahn, but every offer was ignored.

21. Kahn also engaged a firm to conduct a series of tests and interviews on employees at the Director level and above to assess their talents, with a view to offering future professional

development opportunities to each individual. Despite being initially advised that she was to be included in the group of managers participating in this assessment, Jacobs was never tested. In addition, requests Jacobs sent to the CEO seeking permission to attend various external seminars relevant to her job responsibilities were ignored and she was consequently unable to attend.

22.   Jacobs also sought clarification from Kahn and the Apollo Representatives regarding their position on Claire's continued attendance at investment banking sponsored investor conferences. No decision was made at the time and Jacobs was instructed to seek direction from Kahn when future invitations arose. Whenever Jacobs forwarded to Kahn the details regarding conference invitations and sought guidance as to whether or not the company would attend Kahn ignored her inquiries.

23.   Similarly, after the Change in Control, Jacobs sought clarification as to whether she should continue her prior practice of meeting with institutional investors and sell-side analysts. When neither the CEO nor the Apollo Representatives would provide Jacobs with a clear set of guidelines, Jacobs continued to schedule appointments as she had done before. When the Apollo Representatives became aware of this fact, she was instructed to cancel all planned meetings and that no further meetings between Jacobs and the investment community should be scheduled. Jacobs also discussed with Kahn and the Apollo Representatives the need for an "Investor Day" in the absence of any other format to provide information to the bondholders. She was advised that no such meeting would be held in the foreseeable future.

24.   Prior to the Change in Control, Jacobs regularly received research reports authored by sell-side analysts relating to Claire's Stores. Jacobs prepared summaries of each report, which she then disseminated to senior management and the Board of Directors. Following the Change in Control, Jacobs was contacted repeatedly by a new group of sell side

analysts, those covering high-yield debt. They expressed a desire to meet with Jacobs to learn about the company and begin issuing their own analyst reports. Jacobs was instructed to turn down their invitations to meet and most of the analysts consequently refused to cover the company in their research. Those who did, would not supply Jacobs with their reports since no working relationship had been established.

25.     Prior to the Change in Control, Jacobs consulted with the Co-Chief Executive Officers on the need for press releases when material events occurred, prepared and issued those releases and handled all subsequent investor and media inquiries. Between December 2007 and April 2008, this practice ended. Several material events occurred of which Jacobs knew nothing, until being handed completed press release and being instructed to issue them. Her requests for additional information needed in order for her to respond to the subsequent investor and media inquiries were ignored, so that she was unable to offer any insight into these important developments to either the investment community or the media.

26.     Prior to the Change in Control, Jacobs had been responsible for all aspects of the preparation of the quarterly earnings press releases and the related investor conference call. Subsequent to the Change in Control, Jacobs role became essentially that of a secretary. Her timetables for other involved parties to review drafts of each document, prepare answers to anticipated investor questions and rehearse for the conference call were ignored by everyone involved, including Kahn, who had requested the formal timetables. The draft materials prepared by Jacobs were, with the exception of boilerplate, re-written primarily by Kahn to present his messages and strategic initiatives in a manner that Jacobs could not have done because of her limited knowledge of Kahn's plans and objectives. In addition, Jacobs was at times excluded from the drafting sessions, which Kahn conducted behind closed doors with one

or two of his closest associates, so that Jacobs did not even have access to his thinking during the earnings preparation process. This cycle of exclusionary behavior made it impossible for Jacobs to acquire the detailed knowledge she needed about events taking place within Claire's and steadily eroded her capacity to serve as a knowledgeable corporate spokesperson and liason to the investment community and media.

27.     Jacobs had also worked with the Co-Chief Executive Officers prior to the Change in Control on employee messaging, including the drafting of speeches and memos from the Co-Chief Executive Officers to employees. Subsequent to the Change of Control, Kahn made several lengthy presentations to Claire's employees about his plans for moving the company forward. Although he spent weeks preparing these presentations and requested the assistance of numerous members of management, Jacobs was omitted from every facet of the preparation.

28.     Prior to the Change in Control, Jacobs managed relationships with the New York Stock Exchange, depository banks and transfer agent. Subsequent to the Change in Control, these services were no longer needed by Claire's.

29.     Prior to the Change in Control, Jacobs assisted in the periodic review of various corporate policies and procedures relating to employee behavior. Subsequent to the Change in Control, Jacobs discussed with Kahn the need for amendments to those policies and she prepared the amendments. While she distributed them to appropriate parties for review, no one ever responded.

30.     Jacobs continued to report to work on a daily basis following the Change in Control and, as set forth above, carried out her job to the best of her ability given the constrained circumstances. As time went on, however, she was called upon less frequently by investors and journalists. During the course of her employment with Claire's following the Change in Control,

it eventually became apparent to Jacobs that the nature and status of her responsibilities and the conditions of her employment had been materially adversely altered from those in effect immediately prior to the Change in Control and that her job had, to a material degree, been eliminated. Finally, on or about March 28, 2008, Jacobs tendered her resignation for Good Reason to Claire's, with her resignation becoming effective on April 11, 2008.

31. In accordance with the Agreement, within the later of fifteen business days after the effective date of Jacobs's termination date or the expiration of the revocation period in the general release that Jacobs was to execute in favor of Claire's, Claire's was to pay Jacobs a cash lump sum equal to (i) the Severance Multiple (as defined in the Agreement) of 1.5 times the greater of Jacobs's base salary in effect immediately prior to the date of the Change in Control or immediately prior to the event giving rise to her resignation with Good Reason, (ii) the Severance Multiple of 1.5 times the Target Bonus that has been assigned to Jacobs, and (iii) Jacobs's Target Bonus (as defined in the Agreement) multiplied by a fraction, the numerator of which equals the number of days Jacobs was employed by Claire's in the fiscal year in which Jacobs termination occurred, and the denominator of which is 365.

32. The Agreement also provides for the continuation of health benefits for Jacobs for a period equal to the earlier of one and one half years from the effective date of her resignation or the first day that Jacobs becomes eligible to participate in a comparable group health plan maintained by a subsequent employer.

33. In addition, the Agreement provides for payment to Jacobs of any unpaid base salary through the date of her resignation, and any bonus earned but unpaid as of the date of her resignation for any previously completed fiscal year of Claire's.

34. The Agreement also provides for the reimbursement to Jacobs of any unreimbursed expenses properly incurred by her prior to the date on which her resignation became effective.

35. Subsequent to giving notice of her resignation, Jacobs was told by Kahn and the General Counsel, Rebecca Orand, Esq., that they would be in contact with her to discuss her departure as well as the severance and benefits due her. However, no one from Claire's contacted her about her departure or the benefits due her under the Agreement. In a letter from Neil G. Sparber, an attorney for Jacobs, to Rebecca Orand, dated April 24, 2008, Claire's was informed that Jacobs was owed severance and benefits under the Agreement and that payment was to be made by May 2, 2008, which was fifteen business days from the effective date of her resignation. Counsel for Ms. Jacobs also informed Claire's that Jacobs was prepared to execute immediately a general release in favor of Claire's in accordance with the Agreement.

36. In a letter, dated May 1, 2008, from Carol A. Field, Esq., counsel for Claire's, to Neil G. Sparber, Ms. Field stated that "[w]e have reviewed the contents of the letter and disagree with the conclusion that Marisa had 'Good Reason to resign' and that "Marisa had voluntarily resigned." Ms. Fields also stated that "[w]e further disagree with Marisa's conclusion that her resignation triggers any liability or payment under the Termination Protection Agreement."

37. The monies and benefits owed to Jacobs in accordance with the Agreement were to be paid or provided to her within fifteen business days of the effective date of her resignation or the expiration of the revocation period in a general release to be executed by Jacobs in favor of Claire's. Despite due demand having been made by Jacobs, Claire's has failed and refused to pay her the amount due her under the terms of the Agreement and has made no arrangements for the continuation of her family's medical benefits. In fact, Claire's has indicated to Jacobs that if

she wants to continue her health insurance she will have to elect continuation coverage under COBRA and pay the premiums on a monthly basis. The failure to provide health benefits to Jacobs is not only a breach of the Agreement, but it forces Jacobs to use her COBRA election prematurely.

38. By reason of the foregoing, Jacobs has been damaged in an amount to be determined by the trier of fact which plaintiff believes to be in excess of $400,000, together with interest thereon. The medical benefits to which she is entitled are also being denied.

WHEREFORE, Jacobs demands relief on the first claim for relief for damages in an amount to be determined by the trier of fact, but in an amount no less than $400,000, together with interest thereon, as well as the provision of the medical benefits to which she and her family are entitled; and that plaintiff be awarded such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       May 13, 2008

                                    FULBRIGHT & JAWORSKI L.L.P.

                              By: _____
                                  Neil G. Sparber
                                  Samantha Beltre
                                  666 Fifth Avenue
                                  New York, New York  10103
                                  (212)318-3000
                                  Attorneys for Plaintiff Marisa F. Jacobs